IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**STATE OF ARIZONA**,
*Appellee*,

v.

**EMILIO JEAN**,
*Appellant*.

---

No. CR-16-0283-PR
Filed January 3, 2018

---

Appeal from the Superior Court in Coconino County
The Honorable Cathleen Brown Nichols, Judge
No. CR2012-00246
**AFFIRMED**

Opinion of the Court of Appeals, Division One
239 Ariz. 495 (App. 2016)
**VACATED IN PART**

---

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic Draye, Solicitor General, Joseph T. Maziarz, Chief Counsel, Criminal Appeals Section, Terry M. Crist, III (argued), Assistant Attorney General, Phoenix, Attorneys for State of Arizona

Sandra Diehl, Coconino County Public Defender, Brad Bransky (argued), Deputy Public Defender, Flagstaff, Attorneys for Emilio Jean

Stefan M. Palys, Stinson Leonard Street, LLP, Phoenix, and Kathleen E. Brody, American Civil Liberties Union Foundation of Arizona, Phoenix, Attorneys for Amicus Curiae American Civil Liberties Union of Arizona

David J. Euchner (argued), Slade E. Smith, Rule 38(d) Certified Law Student, Arizona Attorneys for Criminal Justice, Tucson, Attorneys for Amicus Curiae Arizona Attorneys for Criminal Justice

———————

CHIEF JUSTICE BALES authored the opinion of the Court with respect to Parts I, II(A), (B), (C), and (D), in which JUSTICES BRUTINEL, TIMMER, and BOLICK joined. VICE CHIEF JUSTICE PELANDER authored the opinion of the Court with respect to Parts II(E) and III, in which JUSTICES BRUTINEL, TIMMER, and GOULD and JUDGE ESPINOSA joined.* CHIEF JUSTICE BALES, joined by JUSTICE BOLICK, filed an opinion dissenting in part and dissenting in the judgment. VICE CHIEF JUSTICE PELANDER, joined by JUSTICE GOULD and JUDGE ESPINOSA, filed an opinion dissenting in part. JUSTICE BOLICK filed an opinion concurring in part and dissenting in part.

———————

BALES, C.J., opinion of the Court with respect to Parts I, II(A), (B), (C), and (D); and PELANDER, V.C.J., opinion of the Court with respect to Parts II(E) and III:

¶1        We consider whether the Fourth Amendment rights of defendant Emilio Jean, a passenger of a truck that he sometimes drove while accompanied by its owner, were violated when police officers collected information over several days from a Global Positioning System ("GPS") tracking device they had placed on the truck without obtaining a warrant. GPS tracking may constitute a search for Fourth Amendment purposes if its use involves a common law trespass, *United States v. Jones*, 565 U.S. 400 (2012), or invades a person's reasonable expectation of privacy, *Katz v. United States*, 389 U.S. 347 (1967). Although we conclude Jean was subjected to a warrantless search that violated his reasonable expectation of privacy and thus his Fourth Amendment rights, the evidence obtained need not be suppressed because the good-faith exception to the exclusionary rule applies.

## I.

¶2        In reviewing a trial court's denial of a motion to suppress, we

———————

* Justice John R. Lopez IV has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Philip G. Espinosa, Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.

consider only the evidence adduced at the suppression hearing and view the facts and reasonable inferences therefrom in the light most favorable to sustaining the court's ruling. *State v. Valenzuela*, 239 Ariz. 299, 301 ¶ 3 (2016). In February 2010, Jean and David Velez-Colon shared the driving of a commercial tractor-trailer from Georgia to Arizona. While the vehicle was in Phoenix, Department of Public Safety ("DPS") officers became suspicious and ran a license plate search, revealing that the trailer, marked "Swift," was reported stolen and that the truck was registered to "Swiff" with Velez-Colon as the company owner. Suspecting that the vehicle was being used to transport drugs, DPS officers installed a GPS tracking device on the truck without obtaining a warrant. Although the officers knew Velez-Colon owned the truck, they did not know Jean was traveling with him.

¶3          Federal Drug Enforcement Agency officers followed the vehicle to Tucson where they witnessed Velez-Colon engage in a suspicious hand-to-hand exchange. The federal agents continued their surveillance of the truck as it returned to Phoenix without dropping off a load. After the truck left Phoenix at 9:30 pm on February 17, 2010, and then as it traveled to California, law enforcement officers monitored it exclusively through GPS, tracking the vehicle to a truck stop, to a warehouse, and then back to a truck stop in Ontario, California, before it returned to Arizona. Velez-Colon and Jean took turns driving. Overall, the officers monitored the truck's movements with GPS for about thirty-one hours over three days.

¶4          Assisted by the GPS location data, a DPS officer stopped the vehicle around 4:00 am on February 19 after it reentered Arizona. When the officer approached the truck, Velez-Colon was in the driver's seat and Jean was lying, apparently asleep, in the truck cabin's sleeping bunk. The officer asked Jean, as the co-driver, to present his driver's license and logbook and asked about their journey. Jean said he was paid to drive by Velez-Colon. The officer separately asked both Velez-Colon and Jean for permission to search the truck; they each refused. After a drug-detection dog alerted to the trailer, officers searched it and found 2140 pounds of marijuana.

¶5          The State charged Jean with conspiracy, illegally conducting an enterprise, money laundering, and transportation of marijuana in an

amount over two pounds. Jean moved to suppress the evidence, arguing that the discovery of the marijuana in the trailer was the result of an illegal search because the officers lacked a warrant when they placed the GPS tracking device on the truck. Jean argued that the GPS tracking violated his possessory and privacy rights under the Fourth and Fourteenth Amendments to the U.S. Constitution and article 2, section 8 of the Arizona Constitution. The trial court held an evidentiary hearing on Jean's motions; he did not testify at the hearing. (Jean also unsuccessfully moved to suppress the evidence based on the officer's allegedly illegal stop of the vehicle, but he abandoned that argument and therefore issues relating to the stop are not before us.)

**¶6** The trial court denied Jean's motion to suppress, reasoning that Jean, as a passenger, did not have standing to object to the State's use of the GPS tracking device on the truck owned by Velez-Colon. Jean was subsequently found guilty as charged and sentenced to two concurrent prison terms of ten years, followed by two concurrent probation terms of five years.

**¶7** The court of appeals affirmed. *State v. Jean*, 239 Ariz. 495 (App. 2016). It reasoned that Jean could not claim his Fourth Amendment rights were violated based on a trespass theory because he was not a bailee and did not otherwise have a possessory interest in the vehicle. *Id.* at 500 ¶¶ 18-19. The court also held that Jean had "no reasonable expectation of privacy in his movements as a passenger or driver of the truck" because "a person travelling in a vehicle on public roads has no reasonable expectation of privacy in the person's movements from one place to another," *id.* ¶ 20 (citing *United States v. Knotts*, 460 U.S. 276, 281 (1983)), "particularly where the government's monitoring is short-term," *id.* (quoting *State v. Estrella*, 230 Ariz. 401, 404 ¶ 12 (App. 2012)).

**¶8** We granted review to determine whether the warrantless GPS tracking constituted a search and violated Jean's rights under the Fourth Amendment, and if so, whether the evidence gathered therefrom should be excluded. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II.

### A.

**¶9**        "We review for abuse of discretion the trial court's factual findings on the motion to suppress, but review de novo the trial court's ultimate legal determination that the search complied with the Fourth Amendment." *State v. Gilstrap*, 235 Ariz. 296, 297 ¶ 6 (2014). The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. A vehicle is an "effect" under the Fourth Amendment, and the installation and use of a GPS tracking device may constitute a search. *Jones*, 565 U.S. at 404.

**¶10**        Although our courts, including the trial court in this case, have sometimes referred to a person's ability to challenge a search "as 'standing' for the sake of brevity," *State v. Peoples*, 240 Ariz. 244, 247 ¶ 8 (2016), the key inquiry is whether the search "has infringed an interest of the defendant which the Fourth Amendment was designed to protect," *Rakas v. Illinois*, 439 U.S. 128, 140 (1978). "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Id.* at 133-34 (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). Thus, whether Jean can challenge the government's use of GPS tracking turns on whether the search violated his own Fourth Amendment rights. *See id.* at 140.

### B.

**¶11**        Jean argues that the warrantless GPS tracking violated his Fourth Amendment rights because it involved a trespass. The State counters that Jean cannot challenge the GPS tracking on a trespass theory because he did not own or possess the truck and concededly "was not the target of the investigation." The State acknowledges that, under *Jones*, the GPS tracking did amount to a trespass, and thus a search, with respect to Velez-Colon, the truck's owner. But the State correctly observes that Jean cannot complain about the search by arguing that it invades another person's constitutional rights. *Cf. Rakas*, 439 U.S. at 137 (refusing to "grant standing to a criminal defendant to assert a violation, not of his own

5

constitutional rights but of someone else's").

¶12        In *Jones*, the United States Supreme Court held that governmental "installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" 565 U.S. at 404 (footnote omitted). The Court explained that "[t]he *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." *Id.* at 409. Thus, a "search" occurs when the government physically trespasses on "persons, houses, papers and effects" to obtain information, irrespective of the *Katz* test. *Id.* at 406-08 (noting that "Jones's Fourth Amendment rights do not rise or fall with the *Katz* formulation").

¶13        Although *Jones* recognized that a government trespass may constitute a search, the opinion did not alter the settled principle that a person can only challenge a search if it invades his or her own Fourth Amendment rights. 565 U.S. at 404-06; *see Rakas*, 439 U.S. at 137; *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1186 (9th Cir. 2015) (noting that because Fourth Amendment rights are personal rights that cannot be asserted vicariously, "when police trespass on property to carry out a search, a defendant has standing to raise the Fourth Amendment only if it was *his* person, house, paper, or effect searched"). In *Jones*, the vehicle was registered to Jones's wife, but Jones was the exclusive driver. 565 U.S. at 404 n.2. The Court observed that "[i]f Jones was not the owner, he had at least the property rights of a bailee," yet it declined to address "the Fourth Amendment significance of Jones's status" because the government had not challenged his "ability to make a Fourth Amendment objection." *Id.*

¶14        Jean cannot challenge the GPS monitoring as a "search" under the trespass theory unless the use of the device constituted a common law trespass as to him. *See id.* at 409-10 (noting that Jones possessed the vehicle when the government "trespassorily inserted" the GPS device); *see also id.* at 419 (Alito, J., concurring in the judgment) ("[T]he law enforcement officers in this case engaged in conduct that might have provided grounds in 1791 for a suit for trespass to chattels. And for this reason, the Court concludes, the installation and use of the GPS device constituted a search." (footnote omitted)). Jean did not own the truck or, as far as the record reflects, ever possess the truck outside the owner's presence.

¶15        We agree with Jean's contention that a bailee of a vehicle could challenge a search under *Jones* because a bailee would be able to challenge a trespass occurring while the bailee possessed the chattel. *See State v. Mitchell*, 234 Ariz. 410, 415 ¶ 19 (App. 2014) (finding lawful possession "sufficient to confer standing under *Jones*" when defendant driver "had the rights of a bailee"); Restatement (Second) of Torts § 217 (Am. Law Inst. 1967) ("Restatement"). But Jean was not a bailee - the record does not reflect that Velez-Colon, the owner, ever ceded possession of the truck to Jean, who instead merely traveled in it, sometimes driving, along with the owner. *See Nava v. Truly Nolen Exterminating of Hous., Inc.*, 140 Ariz. 497, 500 (App. 1984) (stating that a bailment is created "[w]here personal property is delivered to one party by another in trust for a specific purpose, with the . . . agreement that the property will be returned . . . when the purpose is accomplished"); *Webb v. Aero Int'l*, 130 Ariz. 51, 52-53 (App. 1981) (discussing requirement that bailor deliver custody and control of item to bailee).

¶16        Jean argues that a person who is neither an owner nor a bailee may nonetheless have a possessory interest in property sufficient to challenge a search under the trespass test. *Cf. Mitchell*, 234 Ariz. at 417 ¶ 25 (concluding that "one who comes into lawful possession of a vehicle upon which law enforcement has installed a GPS device without permission may assert a Fourth Amendment violation under *Jones* based on a continuing trespass"). Even if we accept this general proposition, it does not avail Jean here. In applying the trespass test, the United States Supreme Court has not clarified whether 18th-century common law or instead more recent precedent determines whether government conduct involves a trespass. *Compare Jones*, 565 U.S. at 404-05 (observing that the government's physical intrusion onto property would have been regarded as a trespass, and thus a search, "within the meaning of the Fourth Amendment when it was adopted"), *with Florida v. Jardines*, 569 U.S. 1, 10-12 (2013) (applying the *Jones* trespass test and holding that a dog's sniff from the doorstep of a home constituted a search); *id.* 16-22 (Alito, J., dissenting) (observing that "[t]he Court's decision . . . is based on a putative rule of trespass law that is nowhere to be found in the annals of Anglo-American jurisprudence," and noting that common law generally recognized a license for people to walk to the front door of a residence); *see also United States v. Sweeney*, 821 F.3d 893, 899-900 (7th Cir. 2016) (remarking that "[n]either *Jones* nor the common law provides sharp boundaries for the meaning of trespass").

¶17        Whether we look to common law or more recent precedent, Jean did not have a possessory interest that would allow him to challenge the GPS installation or monitoring as a trespass. The older common law would not allow someone paid to drive another's vehicle to complain about a trespass to the vehicle. *See* Restatement § 216 cmt. b (noting "older common law" rule that "a servant entrusted with the chattel by his master was not permitted to recover from a third person for trespass to the chattel"). "One who has possession of a chattel for another, and not for himself, cannot maintain an action. . . . So one who is driving the wagon of another is not in possession for himself, but as the servant of the other. His possession is that of the man who hired him to take charge of the wagon." *Scott v. Elliot*, 61 N.C. 104, 106 (1867); *see also Ludden v. Leavitt*, 9 Mass. 104 (1812).

¶18        Although more recent cases recognize that servants, and others who are not owners of a chattel, may have a possessory interest sufficient to maintain an action for trespass, *see* Restatement §§ 216, 217 (citing cases and describing trespass to a chattel, respectively), Jean has not shown that he had such an interest here. When - as the record suggests - a vehicle's owner pays another to drive in the owner's company, the law protects the owner's "right to immediate physical control of it as against all others" by "attributing possession to the one who thus has the right to it." *Id.* § 216 cmt. d.; *see also id.* illus. 3 ("A's chauffeur drives him to his office, and remains in the car to wait for A. During A's absence from the car, A is regarded in possession of it.").

¶19        In addition, unlike Velez-Colon, Jean - on the record before us - did not have the right to exclude others from the truck. That right is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979); *accord Rakas*, 439 U.S. at 143 n.12. Accordingly, courts routinely emphasize the importance of the right to exclude in analyzing Fourth Amendment issues. *See, e.g., Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980) (rejecting a defendant's Fourth Amendment claim when he had no "right to exclude other persons from access" to a friend's purse into which he had placed drugs); *Rakas*, 439 U.S. at 148-49 (denying Fourth Amendment protection to defendants who "asserted neither a property nor a possessory interest in [an] automobile" and had no right to exclude others from the areas searched); *Lyall*, 807 F.3d at 1188, 1189 & n.10 (in evaluating

8

warrantless search of warehouse and whether various occupants had protectible Fourth Amendment interests under trespass theory, court differentiated those who had no "right to exclude others from any portion of the warehouse" from those who did); *United States v. Thomas*, 447 F.3d 1191, 1199 (9th Cir. 2006) (stating that "indicia of ownership - including the right to exclude others - coupled with possession and the permission of the rightful owner, are sufficient grounds upon which to find standing").

¶20　　　　Thus, while Velez-Colon as the owner could challenge the GPS monitoring because it violated his possessory interest (the right to exclude others), Jean cannot because by merely traveling in the vehicle with the owner and sometimes driving, he did not have a right to exclude others. *Cf. Jones*, 565 U.S. at 409-10 (distinguishing Jones's ability to challenge GPS monitoring with device installed while he possessed vehicle from situation where owner consented to installation of tracking device in container before it was acquired by defendant). This conclusion comports with Arizona cases recognizing that a driver who is a "permissive user alone in the car" has Fourth Amendment protection, but a driver of a vehicle "in which the owner was an accompanying passenger" does not. *State v. Orendain*, 185 Ariz. 348, 351 (App. 1996) ("[Courts] expressly distinguish[] [between] cases in which the permissive driver is alone in the car from those in which the owner was present [and] . . . 'constantly in a position to assert his possessory interest to the extent that he desired to do so . . . .'" (quoting *United States v. Jefferson*, 925 F.2d 1242, 1250 (10th Cir. 1991))), *vacated in part on other grounds*, 188 Ariz. 54 (1997).

¶21　　　　Our conclusion may appear inconsistent with decisions by our court of appeals and several federal circuit courts holding that a non-owner driver may consent to a vehicle search even if the owner is present. *See, e.g., State v. Flores*, 195 Ariz. 199, 204 ¶ 14 (App. 1999) (citing numerous federal cases). The issues, however, are different. To challenge a governmental intrusion as a search under the *Jones* test, a person must show that it constitutes a trespass as to him or her, not someone else. The third-party-consent cases, in contrast, turn on whether a driver, although not an owner, had sufficient actual or apparent authority to validly consent to a vehicle search. This is not at issue here. *See id.* at 204 ¶ 17.

¶22　　　　That Jean has no viable Fourth Amendment claim based on a

trespass theory, however, does not end the inquiry. As *Jones* noted, even absent a trespass, "the *Katz* reasonable-expectation-of-privacy test" may apply, and thus "[s]ituations involving merely the transmission of electronic signals without trespass . . . remain subject to the *Katz* analysis." 565 U.S. at 409-11 (emphasis omitted).

## C.

**¶23** Even in the absence of a trespass, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). Jean contends the warrantless GPS tracking of his movements over a few days constituted a search under the *Katz* reasonable-expectation-of-privacy test. The State counters that the Supreme Court's decisions in *Rakas* and *Knotts* establish, respectively, that Jean, as a passenger, had no reasonable expectation of privacy with respect to the truck or its movements over public roadways. The State has never argued that Jean lacked a subjective expectation of privacy with respect to GPS monitoring, and we accordingly do not address that issue, but instead deem it waived by the State. *Cf. Jones*, 565 U.S. at 413 (characterizing as "forfeited" government's alternative argument that warrantless GPS monitoring, if a search, was reasonable because not raised in lower courts).

**¶24** Here we must consider whether a passenger who travels in a vehicle with its owner has a reasonable expectation that the vehicle's movements will not be tracked by non-consensual, surreptitious GPS monitoring by the government. Thus, we have no occasion to consider the effect of an owner's consent to GPS tracking. Moreover, although this case involves a commercial truck, and commercial trucking is a closely regulated industry, *see United States v. Delgado*, 545 F.3d 1195, 1202 (9th Cir. 2008), the State has not argued that this fact is significant in determining whether the GPS monitoring constituted a search as to Jean. Thus, we have no occasion to address whether the regulated status of a commercial truck may affect the legality of investigatory GPS monitoring by law enforcement. *Cf. Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 840 F.3d 879, 886-88 (7th Cir. 2016) (discussing 2015 federal regulations regarding on-board electronic data collection for commercial trucks).

¶25 To be objectively reasonable, an expectation of privacy must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas*, 439 U.S. at 143 n.12); *see also Katz*, 389 U.S. at 361-62 (Harlan, J., concurring). The reasonableness of an expectation of privacy depends in part on whether it relates to information that has been "expose[d] to the public." *Katz*, 389 U.S. at 351. That the public might conceivably obtain information, however, does not necessarily mean that it has been "exposed to the public." Instead, "[i]n considering whether something is 'exposed' to the public as that term is used in *Katz* we ask not what another person can physically and may lawfully do but rather what a reasonable person expects another might actually do." *United States v. Maynard*, 615 F.3d 544, 559 (D.C. Cir. 2010), *aff'd on other grounds sub nom. United States v. Jones*, 565 U.S. 400 (2012); *see also Kyllo*, 533 U.S. at 40 (holding that surveillance of home from street with thermal imaging device "not in general public use" constituted a search).

¶26 Because the State contends that *Rakas* and *Knotts* establish that Jean did not have any reasonable expectation of privacy and thus are dispositive, we first consider those cases. In *Rakas*, the Supreme Court held that passengers in a car driven by its owner did not have a reasonable expectation of privacy in the car's interior, and thus their Fourth Amendment rights were not violated when police conducted a warrantless search of the glove compartment and under the seat. 439 U.S. at 148-49. Although *Rakas* suggests that Jean cannot complain that the State's attachment of the GPS device to the truck constituted a "search" because he had some expectation of privacy in the vehicle's exterior, that observation does not resolve the issue presented here: whether the continual GPS monitoring of a vehicle's movements invaded a reasonable expectation of privacy. Stated differently, whether a passenger reasonably expects to not be subjected to surreptitious government GPS tracking does not depend on whether a passenger has an expectation of privacy in the vehicle's interior or exterior. (Indeed, such tracking conceivably could be conducted by use of devices that are not physically attached to the vehicle.) *Cf. Katz*, 389 U.S. at 351 (noting "the Fourth Amendment protects people, not places").

¶27 We also reject the State's argument that *Knotts* precludes Jean from challenging the GPS tracking. In *Knotts*, the government placed a

beeper inside a metal drum. 460 U.S. at 277. The beeper emitted periodic signals detectable by a radio receiver. *Id.* Police monitored the drum as it was transported by vehicle over public roads to a private residence. *Id.* at 278. The United States Supreme Court held the government monitoring of the beeper signals did not amount to a search. *Id.* at 285. The Court reasoned that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another" because "he voluntarily convey[s] to anyone who want[s] to look the fact that he [is] traveling over particular roads in a particular direction, the fact of whatever stops he [makes], and the fact of his final destination." *Id.* at 281-82.

**¶28**        As *Jones* acknowledged, however, "*Knotts* noted the 'limited use which the government made of the signals from this particular beeper,' and reserved the question whether 'different constitutional principles may be applicable' to 'dragnet-type law enforcement practices' of the type that GPS tracking made possible here." 565 U.S. at 409 n.6 (citation omitted) (quoting *Knotts*, 460 U.S. at 284). Furthermore, five Justices in *Jones* declined to adopt the *Knotts* reasoning regarding public roads when applying the reasonable-expectation-of-privacy test to GPS tracking. *See id.* at 430 (Alito, J., concurring in the judgment) (finding that longer-term tracking, *even on public roads*, intrudes upon a reasonable expectation of privacy); *id.* at 414-15, 417 n.* (Sotomayor, J., concurring) (noting that *Knotts* "does not foreclose the conclusion that GPS monitoring, in the absence of a physical intrusion, is a Fourth Amendment search"). Even before *Jones*, other courts had similarly recognized that *Knotts* was not dispositive as to GPS monitoring. *See People v. Weaver*, 909 N.E.2d 1195, 1199, 1200 (N.Y. 2009) (noting that *Knotts* involved a "single trip" and the Court "pointedly acknowledged and reserved for another day the question of whether a Fourth Amendment issue would be posed if 'twenty-four hour surveillance of any citizen of this country [were] possible, without judicial knowledge or supervision'" (quoting *Knotts*, 460 U.S. at 283)).

**¶29**        GPS monitoring involves materially different technology than did the "very primitive" radio technology used decades ago in *Knotts. Weaver*, 909 N.E.2d at 1199. As the New York State Court of Appeals has noted:

GPS is not a mere enhancement of human sensory capacity, it facilitates a new technological perception of the world in which the situation of any object may be followed and exhaustively recorded over, in most cases, a practically unlimited period. The potential for a similar capture of information or "seeing" by law enforcement would require, at a minimum, millions of additional police officers and cameras on every street lamp.

*Id.*

**¶30** Such technology allows the government to continually gather, store, and mine vast amounts of information at relatively little cost. *See Jones*, 565 U.S. at 415-16 (Sotomayor, J., concurring) (noting the wealth of detail GPS monitoring collects and that "[t]he [g]overnment can store such records and efficiently mine them for information years into the future. And because GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: 'limited police resources and community hostility.'" (citation omitted) (quoting *Illinois v. Lidster*, 540 U.S. 419, 426 (2004))); *Maynard*, 615 F.3d at 565 (finding GPS to be a special kind of intrusion because practical considerations prevent visual surveillance from lasting very long and GPS has such a low marginal cost); *see also State v. Jackson*, 76 P.3d 217, 223 (Wash. 2003) ("In this age, vehicles are used to take people to a vast number of places that can reveal preferences, alignments, associations, personal ails and foibles. The GPS tracking devices record all of these travels, and thus can provide a detailed picture of one's life."); *cf. United States v. Carpenter*, 819 F.3d 880, 889 (6th Cir. 2016) (distinguishing *Jones* because GPS is much more accurate than cell-site data and can tell a much more detailed story of an individual's life), *cert. granted sub nom. Carpenter v. United States*, 137 S. Ct. 2211 (2017). Moreover, GPS devices do not distinguish between private property and public thoroughfares, continuing to generate data even from locations where police themselves would have no right to be. *Cf. United States v. Karo*, 468 U.S. 705, 714-15 (1984) (distinguishing *Knotts* and holding that monitoring of beeper in private residence violated a reasonable expectation of privacy).

**¶31** Courts in other contexts have recognized the need to consider the impact of evolving technology when applying the Fourth Amendment.

Illustrative is the United States Supreme Court's decision in *Riley v. California*, 134 S. Ct. 2473 (2014), which held that police may not search a cell phone incident to arrest without a warrant, *id.* at 2485. The *Riley* Court reasoned that cell phones can "reveal an individual's private interests or concerns" and "[d]ata on a cell phone can also reveal where a person has been," thus "reconstruct[ing] someone's specific movements down to the minute, not only around town but also within a particular building." *Id.* at 2489, 2490 (citing *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)); *see also Kyllo*, 533 U.S. at 40 (holding that use of thermal imaging device "to explore details of the home that would previously have been unknowable without physical intrusion" constituted a search).

**¶32**      We conclude that passengers traveling with the owner in a private vehicle generally have a reasonable expectation of privacy that is invaded by the government's continually tracking the vehicle through a surreptitious GPS tracking device. In addition to the reasons noted above, we note that since *Jones*, at least one other state supreme court has found the government's warrantless electronic monitoring of an individual's movements to be a violation of the Fourth Amendment under the *Katz* reasonable-expectation-of-privacy test. *See Tracey v. State*, 152 So. 3d 504, 526 (Fla. 2014) ("[W]e conclude that such a subjective expectation of privacy of location as signaled by one's cell phone—even on public roads—is an expectation of privacy that society is now prepared to recognize as objectively reasonable under the *Katz* 'reasonable expectation of privacy' test."). And other courts have found that warrantless GPS tracking violates an individual's right to privacy based on their own state constitutions. *See State v. Holden*, 54 A.3d 1123, 1132-33 (Del. Super. Ct. 2010) (finding warrantless GPS tracking violated state constitution on privacy grounds and noting GPS "represents more than a mere alternative to conventional physical surveillance" by enabling "24/7" surveillance); *Commonwealth v. Rousseau*, 990 N.E.2d 543, 553 (Mass. 2013) (finding thirty-day GPS tracking of passenger in vehicle violated state constitution because "a person may reasonably expect not to be subjected to extended GPS electronic surveillance by the government"); *Jackson*, 76 P.3d at 224 (holding, prior to *Jones*, that warrantless GPS tracking of vehicles violates state constitutional privacy provision).

**¶33**      Other states have also enacted laws that impose civil and criminal penalties for using electronic tracking devices and require

14

evidence obtained by such devices to be excluded unless the government obtains the evidence through a warrant. *See Maynard*, 615 F.3d at 564 (citing Fla. Stat. §§ 934.06, 934.42; Haw. Rev. Stat. §§ 803-42, 803-44.7; Minn. Stat. §§ 626A.37, 626A.35; Okla. Stat., tit. 13 §§ 176.6, 177.6; 18 Pa. Cons. Stat. § 5761; S.C. Code Ann. § 17-30-140; Utah Code Ann. §§ 77-23a-4, 77-23a-7, 77-23a-15.5). Such case law and legislation further reflect that society deems reasonable an expectation of privacy in one's movements as concerns GPS monitoring.

¶34     We also reject the State's contention that the GPS monitoring here did not constitute a search because it lasted for only a few days and the truck stayed on public roadways throughout the surveillance. Although Justice Alito's concurrence in *Jones* distinguished between "relatively short-term monitoring of a person's movements on public streets" and "longer term GPS monitoring," 565 U.S. at 430 (Alito, J., concurring in the judgment), we conclude that the duration of the government's GPS monitoring should not determine whether it constitutes a search. As Justice Sotomayor observed, the unique attributes of GPS monitoring in terms of the government's ability to collect information apply even in cases involving short-term monitoring. *Id.* at 415 (Sotomayor, J., concurring). Not only is there no analytical basis to distinguish between longer and shorter-term GPS monitoring for purposes of determining if a search has occurred, but such a distinction would also fail to provide clear guidance to law enforcement for when a warrant is required. *See Estrella*, 230 Ariz. at 409-410 ¶ 33 (Eckerstrom, J., dissenting); *cf. Jones*, 565 U.S. at 412 (noting that concurrence had not explained "why a 4-week investigation is 'surely' too long" (quoting *id.* at 430 (Alito, J., concurring in the judgment))).

¶35     We similarly are not persuaded by the dissent's contention that even if longer term GPS monitoring may constitute a search, Jean cannot complain about the GPS tracking here because it lasted only days and was "reasonable" under the circumstances. *Infra* ¶¶ 76, 80. Such an ad hoc approach to determining whether GPS tracking constitutes a search would ill serve the interests protected by the Fourth Amendment. The United States Supreme Court "repeatedly has acknowledged the difficulties created for courts, police, and citizens by an ad hoc, case-by-case definition of Fourth Amendment standards to be applied in differing factual circumstances," with the main difficulty being "a danger that constitutional rights will be arbitrarily and inequitably enforced." *Oliver v.*

*United States*, 466 U.S. 170, 181-82 (1984); *see also Riley*, 134 S. Ct. at 2491-92 (noting that "[i]f police are to have workable rules, the balancing of the competing interests . . . 'must in large part be done on a categorical basis—not in an ad hoc, case-by-case fashion by individual police officers'" (quoting *Michigan v. Summers*, 452 U.S. 692, 705 n.19 (1981))).

¶36            Equally unconvincing is the dissent's assertion that our decision, as a practical matter, requires "probable cause and a warrant for any governmental installation and use of a GPS device on vehicles." *Infra* ¶ 87. *Jones* establishes that GPS surveillance of a vehicle is a search, and thus subject to the general requirement of a warrant supported by probable cause, with respect to the vehicle owner and others lawfully possessing the vehicle. Our decision recognizes, consistent with societal understandings, that a passenger traveling with a vehicle's owner reasonably does not expect his or her travels to be subject to warrantless, non-consensual, surreptitious GPS monitoring by the government. To instead hold, as the dissent suggests, that whether the GPS monitoring constituted a search as to Jean depends on whether Velez-Colon entrusted the truck to Jean to drive in his absence rather than allowing him to drive and travel in it with Velez-Colon would not serve any interests protected by the Fourth Amendment. Instead, it would ignore the Supreme Court's nearly sixty-year-old admonition that distinctions "often only of gossamer strength, ought not to be determinative in fashioning procedures ultimately referable to constitutional safeguards." *Jones v. United States*, 362 U.S. 257, 266 (1960), *overruled in part on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980).

¶37            By holding that Jean, like the owner Velez-Colon, can challenge the GPS monitoring as a search, we reaffirm the protections embodied in the Fourth Amendment against warrantless government surveillance. Requiring such searches generally to be supported by a warrant based on probable cause does not unduly burden the government's interests, particularly because this requirement already applies with respect to the person who owns or lawfully possesses the vehicle. Treating such surveillance as a search as to passengers protects the privacy interests of both those who own or possess the vehicle and those who travel with them. *Cf. United States v. U.S. District Court* (*Keith*), 407 U.S. 297, 314-15, 321 (1972) (balancing governmental and privacy interests in concluding, categorically, that surveillance for domestic security purposes should be subject to "the

customary Fourth Amendment requirement of judicial approval prior to initiation of a search or surveillance"). Moreover, we have no occasion here to consider, and therefore do not address, how the many well-established exceptions to the warrant requirement, such as exigent circumstances, may apply to GPS monitoring of vehicular travel.

¶38 GPS tracking is qualitatively different from visual surveillance, even on public roadways, because it can monitor "[t]he whole of a person's progress through the world." *Weaver*, 909 N.E.2d at 1199. For the reasons noted, we conclude that *Rakas* and *Knotts* are not controlling and that Jean's expectation of privacy from the warrantless GPS monitoring of his movements is one that "society is prepared to recognize as reasonable." *Hudson v. Palmer*, 468 U.S. 517, 525 n.7 (internal quotation marks omitted) (quoting *Katz*, 389 U.S. at 360, 361 (Harlan, J., concurring)).

## D.

¶39 Jean also argues that the GPS monitoring violated article 2, section 8 of the Arizona Constitution. That provision states that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Jean, however, waived this argument before the court of appeals by raising it for the first time in his reply brief. *See State v. Edmisten*, 220 Ariz. 517, 522 ¶ 10 n.2 (App. 2009). Even so, he has not addressed why or how our constitution should afford greater protection than the Fourth Amendment in this context. Merely referring to the Arizona Constitution without developing an argument is insufficient to preserve a claim that it offers greater protection than the Fourth Amendment. *See State v. Fisher*, 226 Ariz. 563, 565 ¶ 7 n.3 (2011); *State v. Dean*, 206 Ariz. 158, 161 ¶ 8 n.1 (2003). For these reasons, we do not address whether the police conduct violated the Arizona Constitution.

## E.

¶40 The State argues that if we find that the GPS monitoring amounted to a search and violated the Fourth Amendment, we should not apply the exclusionary rule to suppress the evidence. Under *Davis v. United States*, "searches conducted in objectively reasonable reliance on binding

appellate precedent are not subject to the exclusionary rule." 564 U.S. 229, 232 (2011). The State contends that *Knotts* was clearly binding precedent and correctly notes that almost all federal circuit courts have concluded, based on *Davis*, that the exclusionary rule should not apply to pre-*Jones* GPS tracking. *See, e.g., United States v. Brown*, 744 F.3d 474, 478 (7th Cir. 2014) (observing that "all of the extant appellate precedent is on the side of applying *Davis*" to pre-*Jones* GPS tracking).

¶41 We agree with the many courts that have concluded that the good-faith exception applies based on *Knotts*. *See United States v. Katzin,* 769 F.3d 163, 173–75, 182-83 (3d Cir. 2014) (holding officers' reliance on binding appellate precedent of *Knotts* and *United States v. Karo,* 468 U.S. 705 (1984), was objectively reasonable); *United States v. Aguiar*, 737 F.3d 251, 261–62 (2d Cir. 2013) (same); *United States v. Sparks*, 711 F.3d 58, 67 (5th Cir. 2013) (holding that agents' GPS placement on vehicle and monitoring was reasonable under *Knotts* and in-circuit beeper case). As one court has stated, "[w]ithout the benefit of hindsight . . . and with no contrary guidance from the Supreme Court or this Court . . . a reasonably well-trained officer in this [jurisdiction] could have relied on *Knotts* as permitting the type of warrantless GPS usage in this case." *United States v. Stephens*, 764 F.3d 327, 338 (4th Cir. 2014).

¶42 Other state supreme courts have considered the issue and have likewise found the good faith exception applicable to pre-*Jones* GPS monitoring. *See, e.g., People v. LeFlore*, 32 N.E.3d 1043, 1051–53 (Ill. 2015) (finding *Knotts* and *Karo* binding appellate precedent that officer could have reasonably relied upon when installing and using GPS device and that Illinois state officer reasonably relied on Seventh Circuit precedent he considered binding); *Kelly v. State*, 82 A.3d 205, 214 (Md. 2013) (finding *Knotts* sufficiently binding appellate precedent to authorize GPS tracking at the time officers installed the device on defendant's vehicle*); State v. Johnson*, 22 N.E.3d 1061, 1072 (Ohio 2014) (holding that before *Jones*, "*Knotts* and *Karo* provided binding appellate precedent in this state to support the objectively reasonable conclusion that placing a GPS tracking device on a suspect's vehicle did not implicate any protections of the Fourth Amendment").

¶43 The Chief Justice's partial dissent on this issue is

unpersuasive. Asserting that "*Knotts* was not clearly binding precedent on the issue of whether warrantless GPS installation and monitoring constituted an illegal search," and that "neither the United States Supreme Court nor our Court had addressed the propriety of GPS monitoring" as of early 2010, he contends the good-faith exception is inapplicable and therefore the exclusionary rule applies. *Infra* ¶¶ 51, 54. We agree, however, with other courts that have soundly rejected such reasoning.

**¶44** In *Katzin*, for example, the Third Circuit held that the warrantless GPS tracking of the defendant's vehicle for two days in late 2010 was supported by the officers' "objectively reasonable" belief in its constitutionality, "in large part, because it fell squarely within *Knotts* and *Karo*'s well-accepted rationale." 769 F.3d at 179, 182. As had other federal circuits, the *Katzin* court concluded that for "purposes of the good faith inquiry . . . the technological distinctions between the beepers of yesteryear and the GPS device used herein are irrelevant." *Id.* at 176 (citing *Aguiar*, 737 F.3d at 255, 261; *Sparks*, 711 F.3d at 66; *United States v. Fisher*, 745 F.3d 200, 205 (6th Cir. 2014); *United States v. Andres*, 703 F.3d 828, 835 (5th Cir. 2013)); *accord Sparks*, 711 F.3d at 66 (concluding that officers' pre-*Jones* use for eleven days of "a GPS tracker rather than a beeper," despite their different technologies, did not render inapplicable "*Knotts*'s apparent bright-line rule that the Fourth Amendment is unconcerned with police surveillance of public automotive movements").

**¶45** Significantly, *Katzin* expressly rejected the following proposition advanced by the Chief Justice here: to qualify as "binding appellate precedent under *Davis*," a case "must specifically authorize the precise conduct under consideration." 769 F.3d at 176; *see also id.* at 173–74 ("Although the underlying facts in the cases differed—which will nearly always be true—the rationale underpinning . . . *Knotts* and *Karo* clearly authorized" the officers' GPS monitoring). Although the Chief Justice asserts that we read "*Davis* and *Knotts* too broadly and *Jones* too narrowly," *infra* ¶ 49, it is he who reads *Davis* and *Knotts* too narrowly and *Jones* too broadly. The good-faith exception does not require officers to anticipate that *Jones* would "fundamentally alter[] [the] legal landscape," *Katzin*, 769 F.3d at 181, by "unexpectedly depart[ing] from the framework established by *Katz*," on which *Knotts* rested. *Johnson*, 22 N.E.3d at 1071. *Davis* requires good faith and reasonableness, not a crystal ball.

**¶46**        "The exclusionary rule . . . is a prudential doctrine invoked to deter future violations of constitutional rights." *State v. Valenzuela*, 239 Ariz. 299, 308–09 ¶ 31 (2016) (citing *Davis*, 564 U.S. at 236). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Thus, "exclusion is appropriate only where law enforcement conduct is both 'sufficiently deliberate' that deterrence is effective and 'sufficiently culpable' that deterrence outweighs the costs of suppression." *Katzin*, 769 F.3d at 171 (quoting *Herring*, 555 U.S. at 144). Neither factor is present here — there is no allegation, let alone evidence, that the DPS officers' conduct was "deliberate, reckless, or grossly negligent," or involved "recurring or systemic negligence," situations in which "deterrence holds greater value and often outweighs the associated costs." *Id.* (internal quotation marks omitted) (quoting *Davis*, 564 U.S. at 237–39); *cf. State v. Havatone*, 241 Ariz. 506, 511 ¶ 21 (2017) (rejecting the good-faith exception based on a finding of "recurring or systemic negligence").

**¶47**        Because the search in this case was conducted in objectively reasonable reliance on *Knotts* and *Karo*, which constituted binding appellate precedent under *Davis* and the Supremacy Clause, U.S. Const. art. VI; Ariz. Const. art. 2, § 3, we decline to apply the exclusionary rule. *See Valenzuela*, 239 Ariz. at 309 ¶ 31 (quoting *Davis*, 564 U.S. at 238) ("[W]hen law enforcement officers 'act with an objectively reasonable good-faith belief that their conduct is lawful,' deterrence is unnecessary and the exclusionary rule does not apply."). Accordingly, we uphold the trial court's denial of Jean's motion to suppress the evidence obtained from the warrantless GPS installation and monitoring in this case.

## III.

**¶48**        We vacate paragraphs 11–20 of the court of appeals' opinion, affirm the denial of Jean's motion to suppress, and affirm Jean's convictions and sentences.

STATE v. JEAN
CHIEF JUSTICE BALES, joined by JUSTICE BOLICK,
Dissenting in Part and Dissenting from the Judgment

BALES, C. J., joined by BOLICK, J., dissenting in part and dissenting from the judgment.

**¶49**      I respectfully dissent from Part II(E) of the Court's opinion because applying the good-faith exception to the exclusionary rule here, in my view, reads *Davis* and *Knotts* too broadly and *Jones* too narrowly.

**¶50**      *Davis*, as the majority notes, *supra* ¶ 40, held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."  564 U.S. at 232.  Thus, critical to applying the good-faith exception in this context is determining whether "binding appellate precedent" exists with regard to the challenged search.  *See id.* at 247 (differentiating the defendant in *Davis* from "defendants in jurisdictions in which the question remains open"); *id.* at 250 (Sotomayor, J., concurring in the judgment) (noting *Davis* "does not present the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled").

**¶51**      The State argues that the good-faith exception should apply because "*Knotts* was clearly binding precedent officers followed in good faith."  However, *Knotts* was not clearly binding precedent on the issue of whether warrantless GPS installation and monitoring constituted an illegal search.  In *Jones*, the district court ruled that the GPS device installation and monitoring was not a search under *Knotts*.  *See United States v. Jones*, 451 F. Supp. 2d 71, 88 (D.D.C. 2006), *aff'd in part, rev'd in part sub nom. United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), *aff'd in part on other grounds sub nom. United States v. Jones*, 565 U.S. 400 (2012).

**¶52**      In *Jones*, contrary to the district court's ruling in that case - and the State's argument here - the United States Supreme Court recognized that *Knotts* did not resolve the issue of the placement and use of a GPS tracking device.  *See Jones*, 565 U.S. at 408-09, 409 n.6 (stating that *Knotts* "reserved the question whether different constitutional principles may be applicable to dragnet-type law enforcement practices of the type that GPS tracking made possible here" (quoting *Knotts*, 460 U.S. at 284) (internal quotation marks omitted)); *see also id.* at 417 n.* (Sotomayor, J., concurring)

STATE v. JEAN
CHIEF JUSTICE BALES, joined by JUSTICE BOLICK,
Dissenting in Part and Dissenting from the Judgment

(noting same); *Knotts*, 460 U.S. at 284.

**¶53** For the good-faith exception to apply, it is insufficient that law enforcement might have reasonably interpreted precedent as supporting the challenged conduct. Instead, "*Davis* instructs that law enforcement acts in good faith if 'binding appellate precedent specifically *authorizes* a particular police practice.'" *Havatone*, 241 Ariz. at 512 ¶ 24 (quoting *Davis*, 564 U.S. at 241); c*f. United States v. Pineda-Moreno*, 688 F.3d 1087, 1090 (9th Cir. 2012) (reviewing, for purposes of applying *Davis*, whether binding Ninth Circuit precedent existed at time of 2007 GPS search).

**¶54** If *Knotts* had authorized GPS tracking, the Court in *Jones* would have had to overrule rather than distinguish *Knotts*. Because neither the United States Supreme Court nor our Court had addressed the propriety of GPS monitoring, no binding appellate precedent specifically authorized the monitoring here, and the State therefore cannot rely on the good-faith exception to admit the evidence. *See Mitchell*, 234 Ariz. at 419 ¶ 32 (concluding that *Knotts* was "not sufficiently apposite on the trespass question and, therefore, cannot trigger application of the good-faith exception" under *Davis*); *State v. Adams*, 763 S.E.2d 341, 346-47 (S.C. 2014) (applying the exclusionary rule and concluding that "*Knotts* and *Karo* did not constitute binding precedent that authorized law enforcement's warrantless" installation and monitoring of a GPS vehicle tracker).

**¶55** In applying the exclusionary rule, the majority does not identify binding appellate precedent (i.e., a decision by the United States Supreme Court or this Court) that *specifically authorized* the warrantless installation and use of a GPS vehicle tracker within Arizona. The majority instead opines that because "the search in this case was conducted in objectively reasonable reliance on *Knotts* and *Karo*, which constituted binding appellate precedent," the good-faith exception applies under *Davis*. *Supra* ¶ 47.

**¶56** At bottom, the majority applies the good-faith exception because law enforcement officers might have reasonably interpreted *Knotts* and *Karo* as allowing warrantless GPS surveillance of vehicle travel. That approach misapprehends *Davis*, *see Katzin*, 769 F.3d at 187-97 (Greenway, J.,

STATE v. JEAN
CHIEF JUSTICE BALES, joined by JUSTICE BOLICK,
Dissenting in Part and Dissenting from the Judgment

dissenting); *Stephens*, 764 F.3d at 341-42 (Thacker, J., dissenting), and conflicts with our own caselaw, *see Havatone*, 241 Ariz. at 512-13 ¶¶ 29-30 (refusing to apply good-faith exception in absence of binding precedent specifically authorizing particular practice).

**¶57** When caselaw is unsettled regarding the legality of a warrantless search, applying the exclusionary rule desirably prompts law enforcement to err on the side of obtaining a warrant, *see id.* at 512-13 ¶ 29, and thus better protects the rights of privacy enshrined in the Fourth Amendment and our state constitution. Consistent with *Davis* and *Havatone*, I believe we should follow that approach here.

PELANDER, V.C.J., joined by GOULD, J. and ESPINOSA, J., dissenting in part.

¶**58**        I fully join the Court's opinion in Parts I, II(A), (B), (D), and III.  Although I also join in Part II(E) regarding the good-faith exception to the exclusionary rule, I find that discussion unnecessary inasmuch as Jean's Fourth Amendment rights were not violated in this case.  I therefore respectfully dissent from Part II(C) of the Court's opinion because it is supported by neither the law nor the extremely thin record here.

¶**59**        The majority finds a Fourth Amendment violation under the *Katz* reasonable-expectation-of-privacy rubric, reasoning that "*Rakas* and *Knotts* are not controlling and that Jean's expectation of privacy from the warrantless GPS monitoring of his movements is one that 'society is prepared to recognize as reasonable.'"  *Supra* ¶ 38 (citation omitted).  But DPS used the GPS device to simply monitor the movement of Velez-Colon's truck for a short period and only on public thoroughfares, where the truck was plainly visible to anyone; and no evidence in the record suggests that the device was used, or even usable, for more than that.  (In addition, Jean was unknown to DPS and not a target of its investigative surveillance.)  Thus, the majority's concerns about Orwellian invasions of privacy are unfounded here.

¶**60**        In *Katz*, Justice Harlan (in a concurring opinion that has since been adopted as binding) declared that a defendant seeking to invoke the Fourth Amendment's protection bears the burden of proving that he or she has "exhibited an actual (subjective) expectation of privacy . . . that society is prepared to recognize as 'reasonable.'"  *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); *accord State v. Jeffers*, 135 Ariz. 404, 413 (1983) ("The application of the fourth amendment depends on whether the person invoking its protection can claim a justifiable, reasonable, legitimate expectation of privacy that has been invaded by the challenged government action.").  And for a half-century, courts nationwide have applied this two-pronged *Katz* test.

¶**61**        The *Katz* analysis "normally embraces two discrete questions": (1) "whether the individual, by his conduct, has 'exhibited an

actual (subjective) expectation of privacy,'" that is, whether "the individual has shown that 'he seeks to preserve [something] as private'"; and (2) "whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as reasonable,'" that is, whether "the individual's expectation, viewed objectively, is 'justifiable' under the circumstances." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (quoting *Katz*, 389 U.S. at 351, 353, 361); *see also Kyllo v. United States*, 533 U.S. 27, 33 (2001) ("[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."). Jean meets neither of those two prerequisites.

## A.

¶62　　The Supreme Court has made clear that the first, subjective prong of the *Katz* test requires that a defendant take "normal precautions to maintain his privacy." *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980). Indeed, what a person does — or fails to do — directly affects that person's Fourth Amendment protections. *See Rakas v. Illinois*, 439 U.S. 128, 149 (1978). This first aspect of the *Katz* test requires courts to conduct a fact-intensive inquiry that varies from case to case. *Compare United States v. Chadwick*, 433 U.S. 1, 11 (1977) (stating that "placing personal effects inside a double-locked footlocker . . . manifested an expectation" of privacy), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991), and *Katz*, 389 U.S. at 352 ("One who occupies [a telephone booth] [and] shuts the door behind him . . . is entitled to assume that the words he utters . . . will not be broadcast to the world."), *with United States v. Knotts*, 460 U.S. 276, 281–82 (1983) ("When [a motorist] travel[s] over the public streets he voluntarily convey[s] [the details of his travels] to anyone who want[s] to look . . . .").

¶63　　A defendant's failure to present evidence in a suppression hearing about his or her expectation of privacy militates against finding that the first *Katz* prong is satisfied and can thus undermine a Fourth Amendment claim. *See People v. Bryant*, 334 P.3d 573, 612 (Cal. 2014) (affirming denial of motion to suppress evidence seized in warrantless search of house when defendant "presented no competent evidence showing he had an expectation of privacy" in the residence). That is particularly so when, as here, a "deficient record" provides no information

at all on whether the defendant had or exhibited a subjective expectation of privacy. *Id.*

¶64 In *Bryant*, the California Supreme Court found a defendant's failure to testify at the suppression hearing particularly problematic: "[G]iven the subjective portion of the expectation of privacy analysis, it is questionable whether a defendant could carry his burden without presenting his own testimony." *Id*. Other courts are in accord. *See, e.g., United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006) (quoting *United States v. Ruth*, 65 F.3d 599, 605 (7th Cir. 1995) ("[W]ithout an affidavit or testimony from the defendant, it is almost impossible to find a privacy interest . . . ." (internal quotation marks omitted))); *United States v. Erwin*, 875 F.2d 268, 271 (10th Cir. 1989) (concluding that a "defendant, who did not testify at the suppression hearing, failed to introduce any evidence to . . . establish a legitimate expectation of privacy in the particular area searched").

¶65 This approach is quite sensible because finding a subjective expectation of privacy hinges largely — if not entirely — on what the defendant personally intended or expected regarding his privacy interests. *See Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (explaining that the aggrieved party "must demonstrate that he *personally* has an expectation of privacy in the place searched, and that his expectation is reasonable" (emphasis added)). And requiring some showing that the defendant subjectively expected privacy in a particular situation does not prejudice or otherwise disadvantage him because the defendant's testimony in a pretrial suppression hearing generally cannot be used against him at trial. *Simmons v. United States*, 390 U.S. 377, 394 (1968); *see also* Ariz. R. Crim. P. 16.2(A)(4). If no evidence were needed to establish a particular defendant's subjective expectation of privacy, or if that element no longer exists or is automatically presumed in every case involving a warrantless search that reveals contraband, then one would expect the Supreme Court to say so. But it has not. *See, e.g., Bond v. United States*, 529 U.S. 334, 338 (2000) (reaffirming that the "Fourth Amendment analysis embraces two questions").

¶66 Like the defendant in *Bryant*, Jean did not testify at the suppression hearing, and the record here contains no evidence regarding

his subjective expectation of privacy in his location while on public roads. Absent any such evidence or showing on that point, and based on the limited record in this case, Jean's Fourth Amendment claim necessarily fails.[1] *Cf. Peoples*, 240 Ariz. at 247 ¶ 5, 248–49 ¶¶ 11–16 (upholding trial court's order, entered after suppression hearing at which defendant testified, suppressing evidence derived from defendant's cell phone, in which he showed a legitimate expectation of privacy based on his actions and testimony). Therefore, the trial court did not abuse its discretion in denying Jean's motion to suppress based on his failure to satisfy the requisite first prong under *Katz*.

## B.

**¶67** Even assuming that Jean somehow exhibited an actual, subjective expectation of privacy in his whereabouts while travelling on public roadways as a passenger in a commercial truck, this is not a case in which any such expectation is one that "society is prepared to recognize as 'reasonable.'" *See Katz*, 389 U.S. at 361. It is well established that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Knotts*, 460 U.S. at 281; *see also Oliver v. United States*, 466 U.S. 170, 186 n.2 (1984) ("Our cases establish . . . that car owners' diminished expectations that their cars will remain free from prying eyes warrants a corresponding reduction in the constitutional protection accorded cars."); *State v. Estrella*, 230 Ariz. 401, 404–05 ¶ 12 (App. 2012) (same); *cf. State v. Ditren*, 126 A.3d 414, 419 (R.I. 2015) (noting that a mere passenger does not have a reasonable expectation of privacy in the vehicle in which he or she is riding); *Sidener v. State*, 55 N.E.3d 380, 384 (Ind. App. 2016) (same). (My conclusion that Jean lacked a reasonable expectation of privacy rests on this fundamental principle— "[w]hat a person knowingly exposes to the public . . . is not a subject of

---

[1] According to the majority, the State waived any assertion "that Jean lacked a subjective expectation of privacy" by not specifically raising that point. *Supra* ¶ 23. But the State expressly argued that Jean "lacked a reasonable expectation of privacy in his movements on public roads" and specifically referred to *Katz*'s requirement of "a subjective expectation of privacy," a showing only the defendant can and must make. *See Smith*, 442 U.S. at 740; *Bryant*, 334 P.3d at 612.

Fourth Amendment protection," *Katz*, 389 U.S. at 351 — not, as the majority suggests, on whether Velez-Colon entrusted the truck to Jean to drive by himself. *Supra* ¶ 36.)

**¶68**        Neither *Knotts* nor *Rakas* has been modified, let alone overruled, by the Supreme Court. And, more importantly, "[n]othing in the Fourth Amendment prohibit[s] the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afford[] them." *Knotts*, 460 U.S. at 282. Nonetheless, the majority finds those cases inapplicable to the "materially different technology" of GPS tracking and therefore "not controlling" in a world of "evolving technology." *Supra* ¶¶ 29, 31, 38. *Contra United States v. Sparks*, 711 F.3d 58, 66 (1st Cir. 2013) ("[T]he fact that the device was a GPS tracker rather than a beeper does not render *Knotts* inapplicable."); *United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013) (finding "the beeper technology used in *Knotts* sufficiently similar to . . . GPS technology"). But is the state's GPS monitoring of a suspicious commercial vehicle's location on public roadways for less than thirty-one hours any more intrusive, or more violative of a passenger's expectation of privacy, than a warrantless search of the vehicle's interior, including the glove compartment and under the passenger's seat? *See Rakas*, 439 U.S. at 148–49 ("[T]he glove compartment or area under the seat of a car . . . are areas in which a passenger . . . simply would not normally have a legitimate expectation of privacy.").

**¶69**        The majority also contends that "five Justices in *Jones* declined to adopt the *Knotts* reasoning regarding public roads when applying the reasonable-expectation-of-privacy test to GPS tracking." *Supra* ¶ 28. But my colleagues read too much into *Jones*, as the Court expressly declined to address whether Jones had a reasonable expectation of privacy "in the locations of [his] Jeep on the public roads, which were visible to all," and reaffirmed *Knotts*'s holding that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Jones*, 565 U.S. at 406, 412 (alteration in original) (internal quotation marks omitted) (quoting *Knotts*, 460 U.S. at 281).

**¶70**        In his concurring opinion, Justice Alito likewise noted that the

Court "accept[ed]" *Knotts*'s holding "that the use of a surreptitiously planted electronic device to monitor a vehicle's movements on public roads did not amount to a search." *Id.* at 420 (Alito, J., concurring in the judgment). Rather than questioning *Knotts*, he acknowledged its continued validity in permitting "relatively short-term monitoring of a person's movements on public streets." *Id.* at 430. Although Justice Sotomayor in her separate, sole concurrence opined on GPS technology and reasonable-expectation-of-privacy issues, she too agreed that the majority's trespassory test "suffice[d] to decide [the] case" as a "narrower basis for decision," and thus found resolution of the "difficult questions" concerning the other issues "unnecessary." *Id.* at 414, 418 (Sotomayor, J., concurring). Accordingly, although our colleagues valiantly attempt to bootstrap *Jones* as support for their *Katz*-based holding, nothing in *Jones* renders the public thoroughfares doctrine inapplicable to this case — it is still good law. *United States v. Sparks*, 711 F.3d 58, 66 (1st Cir. 2013) (stating that "*Knotts* clearly authorized the . . . use [of] a GPS-based tracking device in the place of a beeper").

¶71 As such, Jean's alleged expectation of privacy must arise from some other source. That source, Jean urges, is the duration and extent of the GPS tracking. He further contends that "[n]o citizen would possibly envision having their every movement tracked" during a two-day, interstate journey. But Jean confuses the relevant standard. The issue is not one of foreseeability, but whether society is prepared to recognize as reasonable Jean's expectation of privacy in his location on public thoroughfares in a commercial vehicle for less than thirty-one hours. *See Estrella*, 230 Ariz. at 404 ¶¶ 10–11.

¶72 On that issue, "nothing is better established in Fourth Amendment jurisprudence than the distinction between one's expectation of privacy in an automobile and one's expectation of privacy when in other locations." *Rakas*, 439 U.S. at 153–54; *see also Knotts*, 460 U.S. at 281 (discussing the diminished expectation of privacy in vehicles). A diminished expectation of privacy in automobiles is largely due to the highly visible nature of vehicular travel, *see, e.g., Cardwell v. Lewis*, 417 U.S. 583, 591 (1974), and the "range of police regulation[s]" to which licensed

motor vehicles are subject, *California v. Carney*, 471 U.S. 386, 393 (1985).[2]

**¶73**     Jean argues that DPS's monitoring was unreasonable because it was more than "fleeting[] observ[ation] by the public," and the majority

---

[2] These considerations now apply with even greater force to commercial vehicles, which are subject to far more regulations than private vehicles. Currently, extensive federal and state regulations govern commercial tractor-trailers as part of a "pervasively regulated industry." *See United States v. Delgado*, 545 F.3d 1195, 1202 (9th Cir. 2008). For example, federal laws subject drivers of commercial vehicles to "hours of service" limitations, *see* 49 U.S.C. § 31137, and require them to install on their vehicles an "electronic logging device" that records, among other things, the hours when and locations where the driver operates the commercial vehicle. 49 U.S.C. § 31137(b)(1); 49 C.F.R. §§ 395.8(a)(1), 395.26(b) (2016). Significantly, these laws "allow law enforcement to access the data contained in the[se] device[s] during a roadside inspection." *Id.* 49 U.S.C. § 31137(b)(1)(B); *accord* 49 C.F.R. § 395.15(b)(2) (2016). And operators of commercial vehicles must now constantly record much more information than the vehicle's location alone, and disclose seven days' worth of this information upon the warrantless demand of a government official. *See* 49 C.F.R. § 395.15(b)(2).

In addition, many states, including Arizona, have laws that require commercial vehicles to report for weigh-ins at ports of entry. *See* A.R.S. §§ 28-369, -5432. The majority does not address these recently-amended laws because they were not argued and do not directly impact this particular case. *Supra* ¶ 24. But given its broad holding, *see supra* ¶ 32, such laws clearly should affect the analysis of future cases involving Fourth Amendment reasonable-expectation-of-privacy claims arising from warrantless searches of commercial vehicles covered by the regulations. *See Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 840 F.3d 879, 893 (7th Cir. 2016) ("In these industries, reasonable expectations of privacy are diminished because an individual who 'embarks upon such a business . . . has voluntarily chosen to subject himself to a full arsenal of governmental regulation.'" (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978))).

apparently agrees. But this also confuses the relevant inquiry. For purposes of the *Katz* test, it matters *what* the police are surveilling, and the *locations* they are observing. That new technology allows police to surveil more effectively public locations and activities does not change the public nature of the location or constitute a violation of one's reasonable expectation of privacy. *See Knotts*, 460 U.S. at 284 (dismissing concerns over technologically enhanced police efficiency as "simply ha[ving] no constitutional foundation"). The Supreme Court cases addressing the government's use of new technologies do not focus on what members of the public likely observe, but whether the surveillance will reveal information that is legitimately considered private or outside public view. *Compare Knotts*, 460 U.S. at 281–82 (stating that a person has no expectation of privacy in information he voluntarily conveys to the public), *with Karo*, 468 U.S. at 716 (stating that electronic monitoring within a residence, or "[i]ndiscriminate monitoring of property that has been withdrawn from public view . . . present[s] far too serious a threat to privacy interests in the home" to escape Fourth Amendment scrutiny).

¶74            When viewed through that proper lens, this case is much closer to *Knotts* than to cases such as *Karo*, 468 U.S. at 716, *Kyllo*, 533 U.S. at 34, 36 (involving thermal-imaging-device "search of the interior of homes" and "observations of the intimate details of a home"), or *Katz*, 389 U.S. at 353 (involving governmental monitoring of a person's confidential conversation in a closed telephone booth, a private setting in which the caller reasonably and justifiably relied on privacy). Nor does this case involve a search of an area that, without technology, police would have to physically intrude to obtain the information sought. In *Kyllo*, for example, thermal imaging allowed the police to penetrate the interior of a home, something mere police surveillance from a public location could not do. 533 U.S. at 40. In contrast, *Knotts* simply allowed the police to follow a car on a public road — something they could accomplish without a beeper or GPS. 460 U.S. at 284. This distinction is critical.

¶75            One who, like Jean, exposes to the public his movements or those of a vehicle in which he rides generally assumes the risk that police may collect information regarding those movements and use it for investigative and law enforcement purposes. *See Smith*, 442 U.S. at 744. The principles underlying this well-established proposition are so robust that

31

the Supreme Court extended their application to aerial surveillance of the curtilage surrounding one's home. *See Florida v. Riley*, 488 U.S. 445 (1986); *California v. Ciraolo*, 476 U.S. 207 (1986). (The majority apparently questions such well-accepted means of surveillance as aircraft detection of speeding motorists because unconstitutional monitoring may "be conducted by use of devices that are not physically attached to the vehicle." *Supra* ¶ 26.) Yet, under the majority's holding, an individual's expectation of privacy in a satellite-assisted reporting of his public vehicular movements is somehow stronger than his expectation to remain free from real-time visual surveillance of his curtilage — "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Oliver*, 466 U.S. at 180 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

¶76 Circumstances certainly may arise where the government's surveillance of a person or a vehicle — even on public thoroughfares — is so pervasive that it violates the Fourth Amendment. *See Jones*, 565 U.S. at 431 (Alito, J., concurring in the judgment). But this is not such a case. Unlike the targeted and nearly month-long GPS monitoring in *Jones*, 565 U.S. at 403, and *Mitchell*, 234 Ariz. at 412 ¶ 4, the GPS device was situated on Velez-Colon's truck for less than three days and monitored for approximately thirty-one hours total. Thus, this case does not involve "the use of longer term GPS monitoring" that prompted Justice Alito's concerns in *Jones*, but rather involves "relatively short-term monitoring of a [vehicle's] movements on public streets," which "accords with expectations of privacy that our society has recognized as reasonable." *Jones*, 565 U.S. at 420 (Alito, J., concurring in the judgment).

¶77 Although it might be difficult to draw the line between permissible and impermissible GPS monitoring based on its duration alone, this case requires no such line-drawing — it simply does not approach any reasonable line that might be drawn. *See Estrella*, 230 Ariz. at 405 ¶ 14 ("Because . . . the use of the GPS device . . . did not constitute a search . . ., we need not determine whether the warrantless but minimally-intrusive use of GPS tracking for the period of time involved here is reasonable and permissible . . . ."). No evidence in the record suggests that the state's limited use of the GPS tracking in this case constituted the "dragnet-type law enforcement practice[]" to which *Jones* referred. 565 U.S. at 408 n.6

(quoting *Knotts*, 460 U.S. at 284), and my colleagues envision, *supra* ¶ 28.

**¶78** In addition, even if line-drawing were required, "[a] legislative body is well situated to gauge changing public attitudes, to draw detailed lines, and to balance privacy and public safety in a comprehensive way." *Jones*, 565 U.S. at 429–30 (Alito, J., concurring in the judgment).[3] That some state legislatures have done so, as the majority observes, *supra* ¶ 33, does not mean that all warrantless installations and use of GPS devices on vehicles, regardless of circumstances or duration, are unconstitutional. (Neither Congress nor the Arizona Legislature has enacted laws relating to the government's use of GPS, thus refuting the majority's suggestion of any national or state consensus "that society deems reasonable an expectation of privacy in one's movements as concerns GPS monitoring." *Supra* ¶ 33). Again, the relevant question is "whether the use of GPS tracking in a particular case involved a degree of intrusion that a reasonable person would not have anticipated," *Jones*, 565 U.S. at 430 (Alito, J., concurring in the judgment), and the answer with respect to Jean is "no." *See Sparks*, 711 F.3d at 67 ("[N]o such expectation attaches to information that is, like one's public movements, 'voluntarily conveyed to anyone who wanted to look.'" (quoting *Knotts*, 460 U.S. at 281)); *Estrella*, 230 Ariz. at 404 ¶ 11 (stating that "the remote electronic monitoring of a vehicle's movement on

---

[3] Legislative solutions in this area might well be influenced by current realities. In this age of pervasive and perpetually-connected "smartphones" and tablets, most of the populace is constantly tracked and physically located by a multitude of "apps" and interests that are routinely granted permission to do so. *See* Andrew G. Ferguson, The Internet of Things and the Fourth Amendment of Effects, 104 Cal. L. Rev. 805, 818–23 (2016). In a similar vein, the public understands that video cameras are ubiquitous, both in cities and on the highways. Thus, the electronic tracking of people's location, both digital and visual, at the very least in public areas, arguably has gained widespread acceptance and cannot be deemed something society would nevertheless reasonably expect to be private. *See* Derek M. Alphran, Changing Tides: A Lesser Expectation of Privacy in a Post 9/11 World, 13 Rich. J.L. & Pub. Int. 89, 129, 135 (2010) (advocating for increased privacy protections and observing that "mass video surveillance" and other forms of digital surveillance in public "reduce objective expectations of privacy").

a public road is considerably less intrusive than" other types of searches).

¶79	The majority expresses grave concerns about the potential "wealth of detail GPS monitoring collects," including locational information that "can reveal preferences, alignments, associations, personal ails and foibles" and "a detailed picture of one's life." *Supra* ¶ 30. The majority also asserts that GPS inexpensively and indiscriminately "generate[s]data even from locations where police themselves would have no right to be," *id.*, echoing concerns voiced by Justice Sotomayor in an opinion no other justice joined, *see Jones*, 565 U.S. at 415 (Sotomayor, J., concurring) (bemoaning that GPS may allow the government to intrusively obtain intimate details about one's personal life, including his or her "familial, political, professional, religious, and sexual associations"). Although admittedly "gather[ing] a wealth of highly-detailed information about an individual's life over an extended period of time" clearly raises Fourth Amendment concerns, *see State v. Zahn*, 812 N.W.2d 490, 498 (S.D. 2012), no such concerns are warranted on the limited facts before us.

¶80	The record contains no evidence whatsoever regarding the capabilities of the GPS device used in this case; the nature and extent of data collected, or even collectable, by the device; or what use DPS made (or could have made) of the GPS data, other than monitoring the movements and whereabouts of Velez-Colon's truck on public roadways. The record merely reflects that the state tracked the location of that truck over a couple days, but it does not otherwise show that the GPS device was used (or even potentially usable) for any of the types of obvious invasions of privacy (for example, surveilling private activities within a residence or other structure, or within the vehicle itself) that cause the majority such consternation. (The relatively brief GPS tracking in this case is a far cry from the "massive invasion of privacy" that resulted from the government's 65-day-long monitoring in *People v. Weaver*, 909 N.E.2d 1195, 1201 (N.Y. 2009). *See supra* ¶¶ 29, 38.)

¶81	The majority cites *Riley v. California*, 134 S. Ct. 2473 (2014), to support its position, *supra* ¶ 31, but that case is inapposite because it did not

address surveillance of any sort.[4]  At issue in *Riley* was a warrantless search of the data contained on the defendant's cell phone, which the police seized during a search incident to an arrest.  134 S. Ct. at 2480–81.  In finding the search unconstitutional, the Court reasoned that search of a smartphone, "a [technology] . . . unheard of ten years ago," is so invasive that it "would typically expose to the government far more than the most exhaustive search of a house."  *Id.* at 2484, 2491.

**¶82**        Again, this case does not involve the government's scouring of a newly invented vault of private information, the invasiveness of which eclipses even the most exhaustive search of a home.  Rather, this case involves the government's collection of information that individuals have knowingly exposed to the public, a permissible practice ever since the Fourth Amendment was adopted.  *See Katz*, 389 U.S. at 351; *see also Knotts*, 460 U.S. at 283.  That DPS used a GPS device to aid in collecting the information does not infringe Jean's Fourth Amendment rights, inasmuch as the Supreme Court "ha[s] never equated police efficiency with unconstitutionality."  *Id.* at 284.

**¶83**        A different *Riley* case is more instructive here than the Supreme Court's *Riley* cellphone-search case.  In *Riley v. Illinois*, 858 F.3d 1012 (6th Cir. 2017) (per curiam), *petition for cert. filed*, __ U.S.L.W. __ (U.S. Sept. 12, 2017) (No. 17-5943), the Sixth Circuit held that law enforcement's warrantless tracking of a defendant using "real-time GPS location data for

---

[4] The majority also cites *Tracey v. State*, 152 So. 3d 504 (Fla. 2014), for support, *supra* ¶ 32, but that case is also inapplicable to the facts before us. In *Tracey*, the Florida Supreme Court concluded that one has a reasonable expectation of privacy in cell site location data.  152 So. 3d at 526.  But the court noted "perhaps most important[]" to its holding was the fact that a cell phone is an "'effect[]' as that term is used in the Fourth Amendment." *Id.* at 524.  Moreover, the court's holding was based, in part, on the "inexorable and significant fact" that because of cell phones' size and their pervasive use, "cell phone tracking can easily invade the right to privacy in one's home or other private areas."  *Id.*  Neither of these factors is implicated here.  As discussed above, the vehicle was not an effect as to Jean, and nothing in the record indicates that the GPS monitoring revealed any confidential details of Jean's private life, personal habits, or the like.

approximately seven hours preceding his arrest, did not amount to a Fourth Amendment search." *Id.* at 1013. The police used the GPS data to follow the defendant to the hotel where he was hiding. *Id.* at 1014. After learning which room was his, the police arrested him. *Id.* at 1014–15. Central to the court's analysis was "[t]he fact that the defendant's movements . . . were visible from public vantage points," *id.* at 1017, such that the GPS tracking did not "reveal movements within the . . . hotel room," *id.* at 1018 (emphasis omitted). The court also noted that both *Knotts* and *Karo* teach that electronically assisted tracking does not violate the Fourth Amendment as long as the tracking "does not cross the sacred threshold of the home." *Id.* The same reasoning and result should obtain here.

¶84 "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *United States v. Knights*, 534 U.S. 112, 118–19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)); *see also Maryland v. King*, 569 U.S. 435, 447 (2013) (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995)) ("[T]he ultimate measure of the constitutionality of a governmental search is reasonableness." (citation and internal quotation marks omitted)); *cf. State v. Adair*, 241 Ariz. 58, 59 ¶ 1 (2016) (warrantless search of probationer's residence "complies with the Fourth Amendment if it is reasonable under the totality of the circumstances"). The installation and short-term use of the GPS device in this case to track and stop Velez-Colon's truck and then apprehend its occupants, though undertaken without a warrant, were reasonable, as those actions clearly were supported by ample and well-supported suspicion of illegal activity. These factors militate against finding a Fourth Amendment violation here based on any alleged reasonable expectation of privacy.

¶85 Rejecting what it characterizes as an "ad hoc approach," *supra* ¶ 35, the majority instead adopts a categorical bright-line rule that automatically prohibits warrantless GPS monitoring regardless of the duration or circumstances. *Supra* ¶¶ 32, 36. But the Supreme Court's jurisprudence is replete with cases that embrace case-specific and fact intensive examinations of Fourth Amendment challenges, a framework Justice Alito found appropriate in this very context. *See Jones*, 565 U.S. at

430 (Alito, J., concurring in the judgment) (noting that Fourth Amendment challenges to GPS tracking must be decided in the "particular case"); *see also Grady v. North Carolina*, 135 S. Ct. 1368, 1371 (2015) ("The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations.").

¶86 The majority cites no authority for the proposition that a non-owner/intermittent driver of a vehicle, who has no right to exclude others from it, nevertheless has an objectively reasonable expectation that the movements of the vehicle will not be monitored via GPS for less than two days. Yet, the majority broadly holds that "passengers traveling with the owner in a private vehicle generally have a reasonable expectation of privacy that is invaded by the government's continually tracking the vehicle through a surreptitious GPS tracking device," *supra* ¶ 32, and that "Jean's expectation of privacy from the warrantless GPS monitoring of his movements is one that 'society is prepared to recognize as reasonable,'" *supra* ¶ 38.

¶87 At bottom, the majority's holding means this: any non-owner/passenger who, with permission and in the presence of the owner, sometimes drives the vehicle has a reasonable expectation of privacy regarding the vehicle such that the warrantless installation of a GPS device on the vehicle's exterior violates that person's Fourth Amendment rights and precludes the government's use of any information or evidence derived from the GPS. In other words, the majority requires probable cause and a warrant for any governmental installation and use of a GPS device on vehicles, even for short-term use for an hour or so and even though reasonable suspicion of illegal activity is evident. The law does not yet compel that result, and the limited facts before us certainly do not warrant it. Therefore, I respectfully dissent from Part II(C) of the Court's opinion.

¶88 One final note: the United States Supreme Court recently held oral argument in *Carpenter v. United States*, No. 16-402 (U.S. filed Sept. 16, 2016), involving the continued viability of the "third-party doctrine" in the digital age. At issue is whether police may, without a warrant, obtain cellphone location information that is routinely collected and stored by

wireless providers, as the Sixth Circuit held. *See United States v. Carpenter*, 819 F.3d 880, 890 (6th Cir. 2016) (distinguishing *Jones* and *Riley* and holding "that the government's collection of business records containing cell-site data was not a search under the Fourth Amendment"). The Supreme Court also recently granted certiorari and scheduled oral argument in *Byrd v. United States*, No. 16-1371 (U.S. filed May 11, 2017), which involves whether a driver has a reasonable expectation of privacy in a rental car when he has the renter's permission to drive the car but is not listed as an authorized driver on the rental agreement, *see United States v. Byrd*, 679 Fed. Appx. 146 (3d Cir. 2017) (holding that sole occupant of a rental vehicle has no Fourth Amendment expectation of privacy and therefore no standing to challenge search of the vehicle when occupant is not named in the rental agreement). *See also United States v. Kennedy*, 638 F.3d 159, 165–67 (3d Cir. 2011) (noting split among the federal circuit courts and collecting cases).

¶89 Whether *Carpenter*, *Byrd*, or some other Supreme Court case will eventually resolve, clarify, or shed light on the GPS issue before us is now unknown. But given the current state of the law, this Court should follow *Rakas* and *Knotts* unless and until those decisions are held to be inapplicable or overruled in the GPS context. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *accord State v. Ring*, 204 Ariz. 534, 557 ¶ 61 (2003) ("We cannot ignore a Supreme Court decision interpreting federal law unless the Court expressly overrules or casts cognizable doubt on that decision."); *see also Sparks*, 711 F.3d at 66 (finding nothing about GPS monitoring, "except for the duration of its use, . . . that could meaningfully distinguish it from the beeper in *Knotts*"). For all of these reasons, I would affirm the trial court's denial of Jean's motion to suppress (without the need for invoking the good-faith exception to the exclusionary rule) and affirm the court of appeals' opinion.

BOLICK, J., concurring in part and dissenting in part.

¶90        The Court today honors our forebears by holding that the state must obtain approval from a disinterested magistrate before it may engage in GPS surveillance under the circumstances presented. Although in many instances this will merely impose inconvenience on the authorities, the warrant requirement marks the dividing line between the rule of law and tyranny. Were the Court to hold otherwise, the state could subject countless individuals and their movements to pervasive and continuous GPS surveillance without meaningful limits. The founders could not have imagined the technology that makes such invasive surveillance possible, but they more than imagined the threat.

¶91        I join fully the Chief Justice's majority and dissenting opinions. I write additionally to express the view that had Jean adequately developed the argument, we might have more easily and appropriately decided this case under the Arizona Constitution.

¶92        Americans enjoy the protections of not one constitution but fifty-one. Our federalist system allows us to interpret our state constitution differently than the U.S. Supreme Court interprets the national Constitution, so long as we do not diminish federal constitutional protections or transgress federal laws enacted pursuant to the U.S. Constitution. In doing so, we frequently may find that our constitution provides greater protections of individual liberty and constraints on government power because of provisions that do not exist in its national counterpart, *see, e.g.*, *Turken v. Gordon*, 223 Ariz. 342, 345–49 ¶¶ 10–22 (2010) (analyzing the "Gift Clause" under article 9, section 7 of the Arizona Constitution which forbids corporate subsides), or because we more strictly construe such protections that exist in both constitutions. *Compare Kelo v. City of New London*, 545 U.S. 469, 488–89 (2005) (holding that the Fifth Amendment's "public use" provision requires only a public benefit), *with Bailey v. Myers*, 206 Ariz. 224, 229–30 ¶¶ 21–26 (App. 2003) (vigorously enforcing the public use requirement under article 2, section 17 of the Arizona Constitution).

¶93        On the issue presented here, our constitution may lend itself

to greater clarity than its federal counterpart. The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," and it specifies a warrant procedure for such searches and seizures. U.S. Const. amend. IV. By contrast, article 2, section 8, of the Arizona Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

¶94 On its face, article 2, section 8 provides a categorical bar against the state disturbing individuals in their private affairs without authority of law. In law, the definition of "disturb" is "[t]o interfere with in the lawful enjoyment of a right." *Disturb*, Webster's New International Dictionary 757 (2d ed. 1944). The right to travel is recognized as a fundamental constitutional right. *See, e.g.*, *Crandall v. Nevada*, 73 U.S. 35, 44 (1868). Applying article 2, section 8 could extricate the Court from the Fourth Amendment jurisprudential thicket outlined in the preceding pages in which the Court must determine whether a police-installed GPS device is a "search," whether a vehicle is "an effect," and whether a co-driver has a possessory interest in the vehicle or a reasonable expectation of privacy. It also could provide greater certainty and predictability to defendants and law-enforcement alike than hitching our jurisprudence to often amorphous and constantly evolving U.S. Supreme Court decisions.[5]

¶95 Other state courts have relied on their own constitutions to determine the propriety of electronic surveillance. *See, e.g.*, *Weaver*, 909 N.E.2d. at 1200–02 (N.Y. 2009) (requiring warrant for GPS surveillance because "the alternative would be to countenance an enormous

---

[5] For instance, we are admonished to determine whether a particular expectation of privacy is "one that society is prepared to recognize as 'reasonable.'" *Katz,* 389 U.S. at 361 (Harlan, J., concurring). While I accept that as a standard we must apply under Fourth Amendment jurisprudence, it is not immediately evident how a court is equipped to determine what society is "prepared to recognize." Nor am I persuaded that constitutional meaning should hinge on what "society" is "prepared to recognize" at any given point. As we develop our state constitutional jurisprudence, we should rely to the greatest possible extent on the text's plain meaning, rather than concoct hopelessly subjective tests that evolve the text's meaning without the benefit of constitutional amendment.

unsupervised intrusion by the police agencies of government upon personal privacy" and "the consequent marginalization of the State Constitution"); *State v. Campbell*, 759 P.2d 1040, 1044 (Or. 1988) (rejecting the reasonable expectation of privacy analysis under the Oregon Constitution).

**¶96** Most salient are cases from Washington State, whose pertinent constitutional provision is identical to ours. *See, e.g.*, *Kotterman v. Killian*, 193 Ariz. 273, 291 ¶ 68 (1999) (concluding that we may find useful guidance in Washington State jurisprudence as much of our constitution was derived from theirs). In *State v. Jackson*, the Washington Supreme Court observed that "vehicles are used to take people to a vast number of places that can reveal preferences, alignments, associations, personal ails and foibles. The GPS tracking devices record all of these travels, and thus can provide a detailed picture of one's life." 76 P.3d at 223. The court thus held that the warrantless placement of a GPS device on a suspect's vehicle was precisely the "trespass into private affairs" that the constitution prohibits. *Id.* at 224; *see also State v. Samalia*, 375 P.3d 1082, 1086–87 (Wash. 2016) (applying the same analysis to cellphone searches).

**¶97** Unfortunately, we cannot resolve this case under the Arizona Constitution because the issue was not fully developed and argued. The vitality of our state constitution requires not only judicial vigilance but adversarial diligence. I hope that future cases will present an opportunity to determine whether our Constitution provides greater limits on government discretion in this context.